# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 6, 2012

## STATE OF TENNESSEE v. ANTONIO WICKS

**Appeal from the Criminal Court for Shelby County**
**No. 10-01779     James M. Lammey, Jr., Judge**

---

**No. W2011-00964-CCA-R3-CD  - Filed April 23, 2012**

---

The defendant, Antonio Wicks, appeals his Shelby County Criminal Court jury conviction of second degree murder, challenging the sufficiency of the evidence to support his conviction, the trial court's limitation of cross-examination of a State witness, and the trial court's imposition of a 25-year sentence. Discerning no error, we affirm the judgment of the court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

Juni S. Ganguli, Memphis, Tennessee, for the appellant, Antonio Wicks.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Lora D. Fowler and Kevin Rardin, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Rubysteen Miller last saw her 17-year-old son, Donald Miller, on February 1, 2008. She picked up the victim from school at 2:15 that afternoon and went home. Soon after arriving home, the defendant, Antonio Wicks, knocked on the door to visit the victim. The two asked Ms. Miller for a ride to "Westwood," and she dropped them off as she went to run errands. At approximately 5:30 that evening, Ms. Miller saw the victim and the defendant talking on her front porch before the two left again. Ms. Miller could not hear their conversation, but she did not detect any animosity between the victim and the defendant. When the victim failed to return home that night, Ms. Miller telephoned the

Memphis Police Department (MPD) to report the victim missing. Ms. Miller testified at trial that she "knew right then and there that something happened because Donald d[id not] stay out at night."

Ms. Miller testified that the defendant and the victim had known each other for "some years" and that, although they were not "kickin' buddies," they were friends. On February 2, Ms. Miller asked the defendant if he knew where the victim might be. The defendant told Ms. Miller that the victim had been involved in a "gang initiation" the previous night. Ms. Miller had no knowledge of the victim's or the defendant's association with gangs until that day.

On Saturday, February 9, Warren Randolph and a friend were walking through the woods behind Chickasaw Middle School when they "stumbled over a body." They immediately contacted a friend's father who called the police. Mr. Randolph recalled that the body was lying "face down with a black hooded sweatshirt on, some khaki pants, and some black socks." Shoes were missing from the body. Mr. Randolph later learned that the victim was an older teenager whom he knew from the neighborhood as "D.J."

Jaqohn Carr and the victim were best friends and also members of the same gang, the Vice Lords. Mr. Carr knew the defendant from the neighborhood and also knew that the defendant was affiliated with another gang, the Bloods. On February 1, 2008, Mr. Carr saw the victim's mother driving the defendant and the victim somewhere. Later that evening, the victim's girlfriend, Kiara Love, stopped by Mr. Carr's home looking for the victim because she and the victim had scheduled a date that night. As Ms. Love and Mr. Carr talked outside Mr. Carr's home, they saw the defendant walking up the street from the vicinity of Chickasaw Middle School. They asked the defendant if he had seen the victim, and the defendant denied knowing anything about the victim's whereabouts. On February 3, Mr. Carr asked the defendant if he knew anything about the victim's disappearance, and the defendant claimed that the victim "went to some type of gang meeting." On February 9, Mr. Carr learned of the victim's death. He went to the scene but did not go into the woods to see the victim. He recalled at trial that the victim was wearing a black hooded sweatshirt, khaki Dickie pants, and black and white Nike Air Jordans when he last saw the victim on February 1, 2008.

Mr. Carr testified that, despite being members of different gangs, the defendant, the victim, and he all grew up in the same neighborhood, would play basketball together, and would casually socialize. He knew of no animosity between the defendant and the victim. On cross-examination, he said that the defendant did not appear to have any blood on his clothing or hands when talking to Mr. Carr on the evening of February 1.

Kiara Love met the victim when she was in the tenth grade, and they dated throughout high school. She last saw the victim at her home on January 31, 2008, but she exchanged text messages with the victim during the school day on February 1. After the victim failed to show up for a date later that evening, Ms. Love telephoned the victim without success. She eventually went to Mr. Carr's home to ask Mr. Carr if he had seen the victim. While at Mr. Carr's home, she saw the defendant walking down the street from the direction of Chickasaw Middle School. She said that when she and Mr. Carr asked the defendant if he had seen the victim, the defendant "act[ed] kind of weird" and "just stood there in silence." Some time before the discovery of the victim's body, Ms. Love and a friend telephoned the defendant and asked if he knew anything about the victim's disappearance. She said that the defendant hung up the telephone on them. She testified that the clothing on the victim's body when it was discovered was the same clothing she had seen the victim wearing on February 1 at school.

MPD Officer Brian Barnes received a call for a "man down" on February 9 and arrived at a wooded area at approximately 5:45 p.m., where he observed the victim "lying face down . . . underneath some leaves." The victim was dressed in a black hooded sweatshirt, khaki shorts, black socks, and no shoes. Officer Barnes assisted in securing the crime scene. When Memphis Fire Department emergency personnel arrived, they pronounced the victim dead from a gunshot wound to his head.

Sergeant Anthony Mullins arrived at the scene where he observed that the victim had a "fairly large size hole" above his right ear that appeared to have been caused by a bullet. Sergeant Mullins also observed that the victim's body had been covered by leaves in an attempt to avoid discovery. On February 10, 2008, Sergeant Mullins questioned the defendant regarding the victim's disappearance. The defendant told Sergeant Mullins that he had seen "some guys put[ting the victim] in a trunk of a car" near the defendant's home. When Sergeant Mullins assisted in conducting a consensual search of the defendant's home, he noted that the defendant's view of the street, as described in his statement, was obscured by hedges outside the home, making it difficult for the defendant to have seen anyone forcing the victim into a car from that vantage point. Sergeant Mullins acknowledged at trial that officers discovered no incriminating evidence – bloody clothing, a gun, or the victim's missing shoes – from the search of the defendant's home.

Doctor Marco Ross, a forensic pathologist with the Shelby County Medical Examiner's Office, performed the autopsy on the victim and determined the victim's cause of death to be multiple gunshot wounds to the head. The victim suffered one contact wound to his right temple, and that bullet lodged in the left side of his scalp. He also suffered three other wounds to the right side of his head. Doctor Ross retrieved three bullets from the victim's brain, two from wounds to the right side of the head and one from a wound to the

left side of the head. Doctor Ross determined the bullet retrieved from the victim's scalp was "medium caliber," but he said that the remaining bullets appeared smaller in size.

MPD Lieutenant Ronald Collins assisted in the missing person investigation initiated by the victim's mother on February 2. Lieutenant Collins interviewed the defendant on February 8, the day before the discovery of the victim's body. The defendant told Lieutenant Collins that he had last seen the victim as he was being forced into a car by three men named "Charles, Mack, and Spudd." The defendant explained that the men pulled up to a stop sign where the victim stood and wrestled the victim into the trunk of their car. The defendant said that the driver, "Spudd," appeared to have a gun. The defendant told Lieutenant Collins that he did not report what he witnessed because he was afraid. He also opined that the men and the victim were "feuding" over a stolen dog.

Kelvin Payne, the victim's cousin, shared a cell block with the defendant at the Shelby County Correctional Center (SCCC) in December 2008 while serving a sentence for driving while impaired. He testified at trial that he overheard the defendant, who did not know Mr. Payne was related to the victim, tell another inmate that he had been charged with murder. Mr. Payne said that the defendant explained that the victim "violated" – a term referring to disrespecting another gang member.

Barrett McReynolds was incarcerated at SCCC in December 2009. While there, he shared a cell with the defendant, who told Mr. Barrett that he was incarcerated for a homicide. Mr. Barrett recalled that the defendant did not discuss his case initially. Over time, however, Mr. Barrett "could tell something was bothering the [defendant]," and the defendant eventually began discussing the case. The defendant told Mr. Barrett that a "young man was shot several times in his head." Through the course of their conversations, the defendant confessed to shooting the victim "behind a school in some woods." In explanation of the shooting, the defendant told Mr. Barrett that "nobody's gonna mess with my cousin."

Jimmy Chambers, an investigator with the Shelby County District Attorney's Office with specialized knowledge in gangs, testified that there are over 20,000 gang members in Shelby County with memberships predominantly in four nationally-known gangs – the Bloods, the Vice Lords, the Crips, and the Gangster Disciples. He further testified that the term "violation" refers to a rule that "if a member do[es] something wrong within the gang set, they would be punished." Mr. Chambers said that punishment could include a drop in "rank," assault, banishment, or death. Mr. Chambers explained that punishment for a "violation" usually occurs within a gang and not between rival gangs. He added, however, that gang initiations sometimes include punishing someone who "disrespects" a rival gang member. Mr. Chambers explained that the gang society does not tolerate "disrespect" and that the consequences of "disrespect" include death.

-4-

On November 2, 2008, MPD Officer Stephen Robert Breth responded to a call of an "armed party fleeing the scene" at the Nike Outlet Store in Memphis. Upon his arrival, Officer Breth apprehended the defendant, whom store personnel identified as the fleeing individual but who was also unarmed when apprehended. A brief search of the area near the defendant's apprehension, however, revealed a "black revolver, police style Colt pistol with tape around the handle." The revolver contained four .32 Smith and Wesson bullets.

On November 2, 2008, MPD Officer Eric Moore was working at the Nike Outlet Store performing "secondary duties" as a loss prevention officer. When a store employee alerted Officer Moore that someone was attempting to steal items from the store, Officer Moore stopped the individual directly outside the store. The person immediately ran, and as the person fled, Officer Moore noticed a revolver with duct tape on the handle protruding from the waistband of the person's pants. He called for assistance, and officers soon arrived to discover the defendant behind a nearby Payless Shoe Store. Officer Moore identified the defendant as the suspected shoplifter. Officer Moore recalled that the defendant was unarmed at his apprehension, but officers located an abandoned gun in the same area where the defendant had been found. The gun's handle was wrapped in duct tape, fitting the description of the one seen by Officer Moore protruding from the defendant's waistband.

The parties stipulated that the defendant was charged with unlawful possession of a weapon stemming from the Nike Outlet Store incident. He pleaded guilty to the offense on February 2, 2009.

MPD Homicide Investigator David Parks acted as lead investigator on the victim's homicide. On February 9, 2008, Officer Parks arrived at the scene near Chickasaw Middle School and confirmed that the body found was the victim, who had been "missing for about a week." On February 27, 2008, Officer Parks forwarded the bullets and bullet fragments collected at the victim's autopsy to the Tennessee Bureau of Investigation (TBI) Crime Laboratory. On December 17, 2008, following the defendant's arrest for the unlawful possession of a weapon, Officer Parks also forwarded the .32 Colt revolver recovered at the outlet mall to the TBI Crime Laboratory.

Cervinia Braswell, a firearms identification expert with the TBI, testified at trial that she first confirmed that the Colt revolver was working properly. Her analysis further revealed that a .32 full metal jacket bullet recovered from the victim's parietal lobe and another bullet recovered from the victim's temporal muscle shared a "mechanical fingerprint" with the Colt revolver and had both been fired from that gun. Ms. Braswell also determined that three .32 bullet fragments bore similar characteristics to having been fired by the Colt revolver; however, she could not make a conclusive match due to the "mutilated

condition" of the fragments. Ms. Braswell opined that a lower velocity weapon, such as the one examined in the instant case, would not produce "as much" blood spatter as a higher caliber weapon.

MPD Lieutenant Richard Borgers testified at trial that the Colt revolver was inadvertently destroyed after completion of the weapons offense prosecution because evidence bureau paperwork had not linked the gun to the instant murder prosecution. Upon learning of this procedural glitch, the MPD implemented additional safeguards and tagging policies to prevent future inadvertent losses of evidence.

On July 20, 2009, Officer Parks questioned the defendant regarding his involvement in the victim's death. The defendant, who had already been convicted of the weapons offense via a guilty plea, denied possessing the gun at the outlet mall. When questioned regarding the victim's death, the defendant became "really non-responsive" and "looked dumbfounded." Officer Parks determined the defendant's lack of candor stemmed from the defendant's wanting to maintain an account consistent with his 2008 statement.

On cross-examination, Officer Parks testified that he talked to witnesses for over a year following the victim's death. He explained his attempts to locate the three individuals that the defendant had claimed forced the victim into a vehicle and related that he followed several leads. Officer Parks explained that the investigation into the three individuals was hampered by the general descriptions and names provided by the defendant in his 2008 statement. Officer Parks said, "[Y]ou're not always sure you're talking to the correct people." He also recalled some hesitancy among neighborhood witnesses to volunteer additional information concerning the victim's death. In fact, several neighbors claimed never to have heard of the individuals named by the defendant, so Officer Parks ultimately assumed that the defendant had fabricated the names. Furthermore, Officer Parks could not substantiate through interviews with any other neighborhood witnesses the defendant's allegation that the victim had been kidnapped from the street corner.

With this proof, the State rested its case-in-chief. Following a full *Momon* colloquy, *see Momon v. State*, 18 S.W.3d 159, 161-62 (Tenn. 1999), the defendant elected not to testify and did not present any proof. The jury convicted the defendant of second degree murder, a lesser included offense of premeditated first degree murder. At sentencing, the trial court sentenced the defendant to 25 years' incarceration as a Range I, violent offender.

On appeal, the defendant contends that the evidence is insufficient to support his conviction because the proof failed to establish his identity as the shooter, that the trial court erroneously limited his cross-examination of Officer Parks, and that the trial court erroneously imposed the maximum sentence of 25 years' incarceration. The State argues that

the evidence sufficiently established the defendant's identity as the shooter, that the defendant waived any allegation of error concerning the limitation of cross-examination by failing to make an offer of proof, and that the record supports the trial court's sentencing decision. We will address each claim in turn.

*Sufficiency of the Evidence*

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.*. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (1997). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. *Id*. § 39-11-302(b).

The defendant argues that the evidence failed to establish his identity as the perpetrator. The victim's mother and Mr. Carr testified that they last saw the victim alive in the defendant's company. Within hours of the victim's disappearance, Mr. Carr and Ms. Love saw the defendant walking up the street from the area where the victim's body was discovered eight days later. The defendant denied any knowledge of the victim's whereabouts initially and later gave inconsistent statements concerning the victim's disappearance. Investigators were unable to substantiate the defendant's claim that the victim was abducted off the street. The victim's homicide remained unsolved for over a year. The defendant's arrest for unlawful possession of a handgun in November 2008 proved to be the major break in the investigation of the victim's death. Ballistics testing matched the handgun to the bullets and bullet fragments taken from the victim's skull. Furthermore, the defendant made several

incriminating statements to inmates while housed at the Shelby County Correctional Center, including an admission to his cellmate that he shot the victim because the victim "mess[ed] with his cousin." In our view, sufficient evidence exists to support the defendant's conviction of second degree murder.

*Limitation of Cross-Examination*

Next, the defendant claims that the trial court erroneously limited cross-examination of Officer Parks regarding a suspect's being charged in an unrelated murder at the time of trial. On appeal, the defendant argues that the trial court should not have excluded the questioning as hearsay. The State argues that the defendant waived consideration of this issue by failing to make an offer of proof at trial.

Prior to beginning cross-examination, the defendant requested a jury-out hearing to allow the trial court to determine the scope of cross-examination concerning Officer Parks's knowledge that an individual named Charles Hampton, the purported kidnapper "Charles" named in the defendant's 2008 statement, was, at the time of trial, housed in SCCC on an unrelated murder charge. The trial court ruled that the defendant could not question Officer Parks about Mr. Hampton's unrelated homicide charge but allowed the defendant to question Officer Parks fully about his follow-up investigation of the three alleged kidnappers and the development, if any, of additional suspects in the case. The defendant did not make an offer of proof. The defendant then questioned Officer Parks at length regarding his attempts to locate or follow-up on the defendant's February 2008 claim that the victim had been abducted by three men. As previously discussed, Officer Parks testified that he was unable to substantiate the defendant's claim either through neighborhood eyewitness reports or by locating the kidnappers named by the defendant.

At the outset, we note that the record belies the defendant's argument on appeal that the trial court erroneously excluded *as hearsay* the cross-examination responses of Officer Parks concerning Charles Hampton's pending unrelated murder charge. At no time during the jury-out hearing did either party argue the admissibility of the evidence via the hearsay rule. Thus, the trial court did not base the limitation of the examination upon hearsay considerations. Indeed, the trial court's comment at the motion for new trial hearing – "having someone being charged in an unrelated killing, I don't see how it was relevant to this particular case" – clearly reflects that the limitation was based purely upon considerations of relevance. Further, we determine that the trial court correctly limited the proof on the basis of relevance, particularly in light of Officer Parks's testimony that his investigation never revealed that the "Charles" referenced in the defendant's February 2008 statement was, in fact, Charles Hampton. Even assuming Charles Hampton was the person referenced in the statement, we cannot discern how an individual's being charged with a homicide at the time

of trial would bear any relevance to that individual's culpability for a completely unrelated homicide that occurred years earlier. *See* Tenn. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Furthermore, the State correctly notes that the defendant failed to make an offer of proof concerning the pending murder charge. *See* Tenn. R. Evid. 103(a)(2) (requiring a proffer by a party opposing the exclusion of the evidence). As such, this issue is waived. *See id*. 103(a) ("Error may not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected" and offer of proof is made.).

*Sentencing*

In his final issue, the defendant argues that the trial court erred by imposing the maximum sentence of 25 years' incarceration. He contends that the trial court's application of enhancement factor (1) based upon his prior criminal history – his unlawful possession of a firearm conviction – resulted in "double-dipping" not allowed by the Sentencing Act because the facts of the firearms conviction were "intertwined with this case." Notably, the defendant does not extend the same argument to the trial court's application of enhancement factor (9) concerning the use of a firearm in commission of the offense. In any event, we determine the trial court's application of enhancement factors was appropriate and that the record supports the imposition of the sentence in this case.

When considering challenges to the length and manner of service of a sentence this court conducts a de novo review with a presumption that the determinations of the trial court are correct. T.C.A. § 40-35-401(d) (2006). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party, in this case the defendant, bears the burden of establishing impropriety in the sentence. T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also Ashby*, 823 S.W.2d at 169. If our review of the sentence establishes that the trial court gave "due consideration" to the appropriate "factors and principles which are relevant to sentencing under the Act, and that the trial court's findings of fact . . . are adequately supported in the record, then we may not disturb the sentence even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Since the 2005 revisions to our sentencing act rendered enhancement and mitigating factors advisory, appellate review does not extend to the weight afforded mitigating and enhancement factors by the trial court. *State v. Carter*, 254 S.W.3d 335, 345-46 (Tenn. 2008). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing decision, the trial court was required to consider:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The trial court should also consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." *Id.* § 40-35-103(5).

In the instant case, the record affirmatively reveals that the trial court carefully "considered the sentencing principles and all relevant facts and circumstances" of the case in arriving at its sentencing determination. Accordingly, we presume that the trial court's determination was correct. *See Ashby*, 823 S.W.2d at 169. The trial court considered as enhancement factors the defendant's prior conviction of unlawful possession of a firearm and his use of a firearm in this case. *See* T.C.A. § 40-35-114(1), (9). We are unpersuaded by the defendant's argument that the consideration of the weapons offense as enhancement was precluded by the fact that the weapons offense itself was a major turn in the investigation of the victim's murder. Additionally, the court correctly noted the advisory nature of the enhancement factors under our current sentencing guidelines. *See id.* ([T]the court shall consider, but is not bound by, the following advisory factors . . . ."); *Carter*, 254 S.W.3d 335. In consideration of the facts and circumstances of this case, the trial court noted that the facts more closely resembled a first degree murder offense rather than a second degree murder

offense. Indeed, the trial court commented at sentencing that "this appeared to be a hit to me." Based upon all of these considerations, the trial court imposed the maximum sentence of 25 years' incarceration. We conclude that the record fully supports the trial court's sentencing determination in this case.

*Conclusion*

The evidence sufficiently established the defendant's conviction of second degree murder, the trial court did not err by limiting cross-examination of Officer Parks, and the record supports the trial court's imposition of sentence. Accordingly, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE